Filed 6/12/13  M.L. v. Super. Ct. CA6
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| M.L.,<br><br>      Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF SANTA CLARA COUNTY,<br><br>      Respondent;<br><br>SANTA CLARA COUNTY DEPARTMENT OF FAMILY & CHILDREN'S SERVICES,<br><br>      Real Party in Interest. | H039486<br>(Santa Clara County<br>Super. Ct. No. JD18242) |

M.L. (mother) seeks writ relief (Welf. & Inst. Code, § 366.26, subd. (*l*); Cal. Rules of Court, rule 8.452)[1] from the juvenile court's order, made at the 12-month review hearing (§ 366.21, subd. (f)), terminating family reunification services and setting a hearing pursuant to section 366.26 to consider selection and implementation of a permanent plan for her son J.L. (son) (born 1999).  She challenges the juvenile court's conclusion that she was provided reasonable services and order terminating visitation. We reject the challenges and deny the petition.

---

      [1] Further unspecified statutory references are to the Welfare and Institutions Code.

LEGAL BACKGROUND AND SCOPE OF REVIEW

Once a child has been detained under juvenile court custody, family reunification efforts are required. (§§ 319, 361.5, subd. (a).) Reunification services are time limited. The cutoff point for fostering family reunification is the 12-month status-review hearing. (§ 361.5, subd. (a)(1)(A).) Services may be extended up to 18 months if it can be shown that a substantial probability exists that the child may safely be returned home within an extended six-month period, or if reasonable services had not been provided to the parent. (*Id.* subd. (a)(3).) At the status-review hearing, the juvenile "court must return children to their parents and thereby achieve the goal of family preservation or terminate services and proceed to devising a permanent plan for the children." (*In re Elizabeth R.* (1995) 35 Cal.App.4th 1774, 1788.)

"[T]he court shall order the return of the child to the physical custody of his or her parent or legal guardian unless the court finds, by a preponderance of the evidence, that the return of the child to his or her parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child. The social worker shall have the burden of establishing that detriment. . . . The failure of the parent or legal guardian to participate regularly and make substantive progress in court-ordered treatment programs shall be prima facie evidence that return would be detrimental. In making its determination, the court shall review and consider the social worker's report and recommendations and the report and recommendations of any child advocate appointed pursuant to Section 356.5; shall consider the efforts or progress, or both, demonstrated by the parent or legal guardian and the extent to which he or she availed himself or herself of services provided . . . and shall make appropriate findings pursuant to subdivision (a) of Section 366." (§ 366.22, subd. (a).)

The reasonableness of reunification services is judged according to the circumstances of the particular case and assessed by its two components: content and implementation. (*In re Ronell A.* (1995) 44 Cal.App.4th 1352, 1362.) "[T]he record

2

should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained *reasonable* contact with the parents during the course of the service plan, and made *reasonable* efforts to assist the parents in areas where compliance proved difficult." (*In re Riva M.* (1991) 235 Cal.App.3d 403, 414.) "Among its components, the reunification plan must include visitation. [Citation.] Visitation must be as frequent as possible, consistent with the well-being of the minor." (*In re Luke L.* (1996) 44 Cal.App.4th 670, 679.)

We review a finding of reasonable reunification services for substantial evidence. (*In re Monica C.* (1995) 31 Cal.App.4th 296, 306.) "Substantial evidence" means such evidence as a reasonable mind might accept as adequate to support a conclusion. (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 820.) An appellate court must construe all evidence in the light most favorable to the trier of fact. (*In re Michael G.* (1993) 19 Cal.App.4th 1674, 1676.) When a finding of fact is attacked on the grounds that it is not supported by substantial evidence, the power of an appellate court begins and ends with a determination whether there is any substantial evidence, contradicted or uncontradicted, which supports the findings. (*In re Cheryl E.* (1984) 161 Cal.App.3d 587, 598.) When two or more inferences can reasonably be deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court. (*Ibid.*) "If there is substantial evidence supporting the judgment, our duty ends and the judgment must not be disturbed." (*In re Misako R.* (1991) 2 Cal.App.4th 538, 545.) The appellate court is barred from reweighing the evidence. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 319.) It may not substitute its discretion for that of the trial court. In reviewing a finding of reasonable reunification services, "[t]he standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances." (*In re Misako R.*, *supra*, at p. 547.) A reviewing court must recognize that in most cases more services could have been provided, and that

the services that were provided were not perfect.  (*Elijah R. v. Superior Court* (1998) 66 Cal.App.4th 965, 969.)

FACTUAL BACKGROUND

Real party in interest Santa Clara County Department of Family and Children's Services (Department) filed the within amended dependency petition on February 8, 2012, pursuant to section 300, subdivision (b) (failure to protect) and subdivision (c) (serious emotional harm).  Son had been residing with a family friend and displayed aggression towards the friend.  Mother suffered from mental health problems, had physically abused son, and acknowledged that son lived with the family friend because her home was not suitable for him.  Son told the social worker that he did not want to live or visit with mother because mother scared him.  In March, the juvenile court found jurisdiction and ordered reunification services to consist of a parent orientation class, parenting class for parents of children with challenging behavior, and a psychological evaluation after which mother followed any recommendations.  It also ordered one-hour once-a-week, supervised, therapeutic visitation.  In January 2013, after a contested hearing, it granted the Department's petition to modify, suspended visitation, and ordered the Department to consult with son's therapist "about ways that visitation could be accomplished."

For the 12-month review hearing on February 11, 2013, the social worker reported the following in recommending that reunification services and visitation be terminated: in April 2012, the initial social worker gave mother a parent orientation referral, but mother later stated that she was not contacted for details on when and where to start the class; in August 2012, the social worker gave mother another referral but mother did not attend the class; in September 2012, the social worker gave mother another referral but mother did not attend the class; in January 2013, mother asked the social worker for a new referral for a class to begin in February; mother attended eight of 10 parenting classes and graduated in June 2012, though she did not complete the homework for many

4

topics; until August 2012, mother participated in telephonic wraparound services (reunite with children having serious disturbances), but she refused to participate in person when son's caregiver was present, never arranged to participate in person when son's caregiver was absent, and did not wish to discuss any issues with the service providers "except how her son was stolen from her, and how she desired visits with him"; in August 2012, the social worker invited mother twice to participate in wraparound services but mother stated that she was unavailable; in September 2012, mother told the social worker that she "did not wish to discuss anything else but visits with [son]," son was "only a child and should be told what to do," and she did not wish to participate in wraparound services "until the issue of visitation with [son] was []resolved in Court" and "if her visits were cancelled by the Court, she did not wish to meet with anyone"; mother refused the services of a Family Partner from the wraparound program who was prepared to support mother "with removing barriers to reunification"; the Family Partner told the social worker that mother was "very focused only on her own personal needs" and "was unable to focus on the needs of [son] and on efforts established to help [son] reunify with [mother]"; in January 2013, mother told the wraparound services facilitator that "she wanted to discuss only the issue of how her son was stolen from her"; on another occasion in January, mother told the facilitator that she did not want to meet until after the February 11 court date "because she wanted to see how things go in court first."

The social worker finally added in her report that she had sent monthly certified mail to mother encouraging mother to meet and discuss reunification services but mother had not called to schedule an appointment and (1) during one telephone call from the social worker, mother stated that "all she needs is visits with her son, 'that's it,' " and (2) during a January court conversation for the purpose of discussing reunification services and the Department's 12-month-hearing recommendations, mother "continued to work on a crossword puzzle as [the] social worker attempted to have a talk with her [and] responded that she did not wish to talk . . . until a visit with her and [son] is arranged."

5

The report also noted the following: the court-ordered psychological evaluation reported of mother that "if she were able to attend classes and therapy she may make improvements in her parenting skills but it is not clear she will be able to follow through on these recommendations and engage in the process of change"; in January 2013, son's therapist told the social worker that he would not wish to supervise therapeutic visits because "he did not believe the visits would be in [son's] best interest"; son stated to the social worker "that he is focused on moving to Indiana to reside with his maternal aunt and her family [and] does not want to be forced to see his mother and he does not want to be forced to return home."

Among other points, the social worker finally reported the following. "Perhaps because she does not believe that [son] suffered mental/emotional and physical harm while in her care, [mother] has resisted participating in Court ordered services necessary towards reunification with [son]. It seems that she has wanted support, but only on her own terms. She failed to participate in a Parent Orientation class which would have helped her better understand the Juvenile Dependency Court process and [the Department's] role and support in the reunification process. Even if she participated in Parenting Class, she was unable to complete all homework as requested, as per the facilitators' assessment. She wants to participate in wraparound only on a one-on-one basis with the facilitator, and in therapy, only over the phone, on weekends and weekday evenings. [¶] Additionally, [mother] has been moving into a new residence since August 2012, and has largely given the moving as the reason for her unavailability to participate in services. The level of energy she put into moving and not into participating in [wraparound] and other services designed to help her reunify with [son] shows a deeper underlying mental health concern."

After a contested 12-month review hearing at which the social worker and mother testified, the juvenile court explained the following.

"Regarding reasonable services, the next issue is: Does the Court find by clear and convincing evidence that reasonable services were offered? As you all know, that was a big issue during the contested hearing. The case law regarding reasonable services indicates that services offered certainly don't have to be perfect services. They don't have to be the best services. They have to be reasonable under the circumstances. [¶] The Court is going to find that the Department did provide reasonable services, and I do make that finding by clear and convincing evidence. I did review the notes from the contested hearing, as well as the social worker report, and the addendum reports. The reports are replete with examples of situations where the Department attempted to provide services, but [mother] was simply unwilling to participate. [¶] Now, I will indicate, for example, that the parent orientation class was offered to [mother] back when we started. I believe the first--the evidence in the report is that the first referral was made in April of 2012, and yet [mother] only recently completed the class in 2013. [¶] Another part of the case plan was to participate in [wraparound] meetings. Those are child and family team meetings. The evidence before the Court is that up until August of 2012, [mother] participated by phone, was not able or willing to be personally present, and then had excuses and reasons for not continuing participation. Initially, it was the housing search. And there were other reasons provided that she was unwilling to participate unless visitation was provided to her. [¶] As part of wrap-around services, [mother] was offered the assistance of a family partner, who is a team member of the WRAP team. At one point, [mother] did refuse those services. At one point, [mother] indicated that she would not participate in the [wraparound] meetings until the visitation issue was resolved. [¶] There was the issue of the social worker coming to [mother's] home. From the beginning of the case, [mother] has been unwilling to allow a social worker into her home. As a part of the 12-month review, this particular social worker tried to schedule a home visit, and [mother] was unwilling to allow this social worker into her home. There are examples in the report of [mother] being unwilling to even talk to the social worker here at court while

7

waiting to come into the hearings. [¶] Another part of the case plan was therapy. Having reviewed my notes, I see that as early as May of 2012, [mother's] counsel informed the Court that [mother] was working on setting up therapy with EMQ, Eastfield Ming Quong. By September of 2012, the Court was made aware that [mother] was not in counseling. By the time we had the trial in early March, [mother] had participated in only four in-person sessions. [¶] Now, [mother] did participate in the psychological evaluation but indicated, even when it was ordered, that she had no intention and didn't want to follow the recommendations, which the Court also ordered. [¶] The Department provided services. The Department offered services, but it appears to the Court that [mother] was unwilling to participate in those."

Regarding visitation, the juvenile court added the following.

"I do want to take a moment and address the visitation issue, because, as we all know, it has been a running theme almost from day one of this matter. It has been a very challenging issue. When [son] was first taken into protective custody, he was 12 years old but just shy of his 13th birthday, about three months shy of turning 13. From the beginning, [son] has fairly adamantly refused to visit. Early on, [son's] attorney wanted termination of visitation based on detriment, and the Court refused, because I needed evidence of detriment. Being too early in the case, there was no evidence. [Son] refusing to visit meant also that there was no evidence of detriment. [¶] It's ironic for the Court that to terminate visitation based on detriment, I have to force the visits and force the child to be in a situation that is uncomfortable and that has negative outcomes, which is certainly contrary to the Court's role of trying to protect children. Be that as it may, there has to be evidence for detriment. As the Court has indicated time and time again in this matter, visitation is integral to reunification, which is why the Court took a very hard line approach to not terminating visitation but, instead, trying to push the matter, to press the matter. The Court, as you all know, tried various methods of getting [son] to visit. [¶] At one point, he was here in open court, and the Court spoke with him and asked him to

8

please try to visit and told him of some of the consequences, including the fact that it might be a reasonable services issue. I hope I explained that to him in a way that was more understandable than that. I asked him personally to visit. He agreed to try. [¶] . . . [¶] The Court also tried conditioning his visitation with his aunt, his travel to see his aunt in Indiana, on his visiting. And I will indicate I did so not feeling particularly comfortable about that, because that is a very heavy-handed way to try to get a kid to visit. We tried that, and the first visit, I think, was fairly disastrous with [son] wearing his headphones the entire time and refusing to engage. I tried it a second time for another visit, ordering two visits before he traveled, and then in the interim received a 388 with evidence of some potential detriment, so I rescinded that condition. [¶] The Court has been keenly aware throughout this matter that as we try to reunify and as we push the issue of visitation that our doing so can be harmful to a child. I have to balance the parent's right to visit, the parent's right to attempt reunification, with the child's mental health and his stability. And I will remind everybody that [son] came to this court quite fragile and in a rather compromised emotional state. It is clearly illegal for this Court to indicate that a child shall not be forced to visit, and this Court never made such an order. But there is also awareness that when you have a fragile 13-year-old, that we cannot and we will not physically drag him to a visitation kicking and screaming. We have to use other methods. And the Court believes that both the Court and the Department attempted to use those other methods. [¶] This is certainly not the first case I've had where the child has refused to visit and the Court has ordered the Department to continue checking in with the child about visitation, even when the child responds to the social worker, 'You're stressing me out, stop asking me,' which is what happened here. The very act, actually, of the social worker asking [son] about visits and trying to talk to him about visits was stressful for him and caused him anxiety. That's why I say this issue is a very challenging issue for the Court. [¶] I believe that the Court and the Department did what

9

it could to try to get [son] to visit.  He is simply unwilling, and he has been for some time."

The juvenile court was also constrained "to comment on the credibility of the two witnesses" and offered that the social worker was "a credible witness" but mother's "perspective of reality and the truth is a little different than the Court perceives it."

DISCUSSION

Mother contends that the juvenile court "ERRED IN ITS FINDING THAT THE DEPARTMENT HAD PROVIDED REASONABLE SERVICES."

Mother claims that the social worker "failed to maintain reasonable contact with [her]" ("had only five contacts").  She complains that the social worker failed to address her specific needs ("failed to ensure the EMQ coordinator and therapist were aware of the [psychologist's] recommendation that Mother received insight oriented therapy rather than behavioral").  She adds that the social worker did not use the judge's reasoning "to attempt additional visits" and "abdicated its duty to make the visits happen by allowing [son] and his therapist to dictate the entire process."

Mother's analysis is erroneous.  It is no more than a reargument that, at best, demonstrates that the juvenile court could have decided in her favor.  It is not the goals of the reunification services, but only the execution of the details that draws mother's ire.  In short, mother identifies faults which might establish that the services offered were not ideal, but that is not the test.  Most critical for appellate review purposes, however, mother's analysis overlooks the juvenile court's conclusion--from the extensive facts in support of the judgment recounted above--that the Department attempted to provide services to mother but mother "was simply unwilling to participate."

"Reunification services are voluntary, and cannot be forced on an unwilling or indifferent parent."  (*In re Jonathan R.* (1989) 211 Cal.App.3d 1214, 1220.)  "The requirement that reunification services be made available to help a parent overcome those problems which led to the dependency . . . is not a requirement that a social worker take

10

the parent by the hand and escort him or her to and through classes or counseling sessions. A parent whose children have been adjudged dependents of the juvenile court is on notice of the conduct requiring such state intervention. If such a parent . . . waits until the impetus of an impending court hearing to attempt to [correct his or her own behavior], the legislative purpose of providing safe and stable environments for children is not served by forcing the juvenile court to go 'on hold' while the parent makes another stab at compliance." (*In re Michael S.* (1987) 188 Cal.App.3d 1448, 1463, fn. 5.) If mother felt the social worker was not helping her complete her case plan requirements, she "had the assistance of counsel to seek guidance from the juvenile court in formulating a better plan." (*In re Christina L.* (1992) 3 Cal.App.4th 404, 416.)

In summary, the juvenile court could have reasonably concluded that it was mother's failure to participate in the provided services that justified a finding that it was detrimental to return son to her care rather than a deficiency in the type of services. We therefore conclude that there is substantial evidence to support the juvenile court's finding that the reunification services offered to mother by the Department were reasonable.

Mother also contends that the juvenile court "ERRED IN FINDING DETRIMENT AND TERMINATING VISITS BEFORE THE . . . 366.26 HEARING." According to mother, there was not "sufficient evidence of emotional damage caused by the visits that occurred." She concedes that son "was calm, albeit uncomfortable, during the visits." But she concludes that this emotional state did not rise to a level justifying the termination of visitation.

There is no merit to the point. Son was 13 years old. From the beginning he did not want and resisted the visitation arrangements whether made by the Department or suggested by the juvenile court. The juvenile court concluded from the evidence that the

visits had been "stressful for him and caused him anxiety."[2]  Mother herself concedes that son "was somewhat anxious before the visits, or when contemplating having to attend visits."  From this, the juvenile court could have rationally concluded that "continuing [the visits] would be harmful to [son's] emotional well-being."  (*In re Brittany C.* (2011) 191 Cal.App.4th 1343, 1357.)  Mother's conclusion from the evidence is simply one at odds with the juvenile court's contrary conclusion from the evidence.

---

[2] Mother's solution to son's resistance was to punish son for not visiting, "punishing him by not allowing him to visit his aunt" or "tak[ing] away his electronics as a consequence."

12

## DISPOSITION

The petition for writ of mandate is denied on the merits. (Cal. Rules of Court, rule 8.452(h)(1).) This opinion is final as to this court immediately upon filing. (*Id.* rule 8.490(b)(1).)

_____
Premo, J.

WE CONCUR:

_____
Rushing, P.J.

_____
Elia, J.